**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ENVIRONMENTAL EQUIPMENT & SERVICE COMPANY, | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 08-1478** |
| | : | |
| **WACHOVIA BANK, N.A.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**September _23rd__, 2010**                                                    **Anita B. Brody, J.**

## MEMORANDUM

I. INTRODUCTION                                                                                    2

II. BACKGROUND                                                                                   3

III. LEGAL STANDARD                                                                           7

IV. DISCUSSION                                                                                     8
   A. EES's Common Law Claims Are Displaced by the PCC . . . . . . . . . . . . . . . . . . . . . 9
      1. Comprehensive Remedial Scheme Provided by the PCC . . . . . . . . . . . . . . . . 9
         a. Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
         b. Contract and Duty of Good Faith Claims . . . . . . . . . . . . . . . . . . . . . . . 11
      2. Purposes of the Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   B. PCC Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      1. Default Rules of PCC Determine Wachovia's Liability Period . . . . . . . . . . . 15
         a) No Reasonable Discoverability Requirement in Section 4406(f) . . . . 17
         b) No Bad Faith Exception to Section 4406(f) . . . . . . . . . . . . . . . . . . . . 18
      2.   Section 4406(f)'s One-Year Notice Requirement Triggered . . . . . . . . . . . 20
   C. No Further Contractual Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      1. Exclusion of Evidence Regarding the Agreements . . . . . . . . . . . . . . . . . . . . . 24
      2. Binding Effect of the Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   D. Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
   E. Uniform Fiduciaries Act ("UFA") claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   F. Absent Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

V. CONCLUSION                                                                                    38

## I. INTRODUCTION

This case arises out of an embezzlement scheme perpetrated by Elizabeth Greenawalt ("Greenawalt") against her employer, Plaintiff Environmental Equipment & Service Company ("EES").[1]  Greenawalt, acting as EES's bookkeeper, embezzled nearly $1 million between 1997 and 2006 through fraudulent banking practices at a Linwood, Pennsylvania branch office of Wachovia Bank, N.A. ("Wachovia").  In this action, EES seeks to recoup its losses from Wachovia. According to EES, Wachovia should have been suspicious of Greenawalt's unusual banking activity and prevented her from carrying out her nine-year scheme.

Pending before me is Wachovia's Motion for Summary Judgment regarding nine counts of EES's Amended Complaint:  negligence (Count I); breach of contract (Count V); breach of duty of good faith and fair dealing (Count VI); violations of Pennsylvania's Commercial Code ("PCC" or "Code"), 13 Pa. Cons. Stat. Ann. §§ 3307, 3406, 4401, 4406 (West 1999) [hereinafter PCC §§ 3307, 3406, 4401, and 4406] (Counts VII-X); aiding and abetting (Count XI); and violations of Pennsylvania's Uniform Fiduciaries Act ("PUFA"), 7 Pa.. Cons. Stat. Ann. § 6351 *et seq*. (West 1995) (Count XII), specifically §§ 6381, 6382, and 6391-93. Also under my consideration are EES's Memorandum in Opposition to Defendant's Motion for Summary Judgment, Wachovia's Brief in Support of its Motion for Summary Judgment, EES's Reply Memorandum in Opposition to Defendant's Motion for Summary Judgment, and Wachovia's Sur

---

[1] This matter was initiated by Ralph S. Bucci, the former owner of EES.  During the pendency of this case, Bucci sold his business, including his interest in this lawsuit, to his son, Stephen Bucci, and requested that I substitute EES as the plaintiff.  On October 7, 2009, I granted Bucci's request.  *See* Order, Oct. 7, 2009, ECF No. 59.

Reply.

For the reasons that follow, I will grant Wachovia's Motion for Summary Judgment in part and deny in part. I will grant the Motion with regard to EES's negligence (Count I), breach of contract (Count V), breach of duty of good faith and fair dealing (Count VI), and PUFA (Count XII) claims. I will also grant the Motion with regard to EES's remaining claims–the PCC claims (Counts VII-X) and aiding and abetting (Count XI)–but only to the extent that they are barred by the applicable statute of repose and/or statute of limitations.[2]

## II. BACKGROUND[3]

Ralph S. Bucci formed EES as a sole proprietorship in 1973. EES distributes water and sewage treatment equipment to municipalities. In 1980, Bucci hired Greenawalt, his neighbor, to perform bookkeeping and secretarial duties for the company. By 1985, Bucci was doing all of his business and personal banking at the Linwood branch of Wachovia in Linwood, Pennsylvania

---

[2] *See In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 194 n.6 (3d Cir. 2007) ("A statute of limitations is a law that bars claims after a specified period. It is generally subject to a discovery rule, meaning that it does not begin to run until the plaintiff is aware (or should be aware) of his claim. A statute of repose is a statute barring suit that is brought after a specified time since the defendant acted. It is generally not subject to a discovery rule." (internal quotations and citations omitted)). "Section 4406(f) is not a statute of limitations *per se*, but rather 'a precedent to an action which, unlike a statute of limitations, cannot be tolled.'" *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 785 n.9 (E.D. Pa. 2008) (quoting *Euro Motors, Inc. v. Southwest Financial Bank and Trust Co.*, 696 N.E.2d 711, 716 (Ill. App. Ct. 1998) [hereinafter *Bucci I*]; *see also Wetherill v. Putnam Invs.*, 122 F.3d 554, 557 (8th Cir. 1997) ("U.C.C. § 4-406(4) establishes a statute of repose under which the time for bringing suit expires one year following the availability of the relevant account statements.").

[3] On a motion for summary judgment, the facts are interpreted in the light most favorable to the non-moving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). All facts are taken from EES's Statement of Facts, its briefs in opposition to Wachovia's motions for summary judgment, and any undisputed affidavit, deposition testimony, or record exhibit.

(the "Linwood Wachovia").[4] EES had two accounts with Wachovia: a regular checking account (the "EES Account") that the business used to deposit income and pay expenses; and a command asset program account (the "CAP Account"), which functioned as an interest-bearing checking account. EES was not a "cash business," meaning that it did not receive payments in cash and did not have a practice of issuing checks payable to "Cash." The company's financial records were maintained in handwritten ledgers and later in electronic format.

From 1985 to 2006, Greenawalt took weekly trips to the Linwood Wachovia to conduct financial activities on behalf of EES. Greenawalt was responsible for depositing checks, preparing checks payable to creditors, which the Buccis would review and sign, and for maintaining the company's financial records. However, Greenawalt never had the authority to draw or indorse checks on the company's behalf. Only Ralph Bucci and his son, Stephen, were authorized to sign checks on behalf of EES; they were the only authorized signatories on the EES and CAP Accounts.

From 1985 to 1997, on a weekly basis Greenawalt deposited checks payable to EES totaling between $15,000 and $30,000 at the Linwood Wachovia. In addition, every two weeks she cashed and/or deposited her biweekly paycheck, which ranged from $600 to $1200 over the years, into her own personal account at the bank. During that time, Greenawalt did not regularly cash company checks at the Bank; she had no authority to draw checks payable to cash and the Buccis rarely made checks out to cash. Some of the Linwood Wachovia employees who dealt

_____

[4] Although the location of the physical bank itself never changed, the Linwood branch was owned by several different banks prior to Wachovia. Wachovia did not acquire the branch until 2001, but for ease of reference, and because Wachovia is liable for its predecessors' actions, I will refer to the Linwood branch as simply the Linwood Wachovia.

with Greenawalt knew that she was EES's bookkeeper. Some of them also knew Ralph and Stephen Bucci because both did their personal banking at the branch.

Beginning in late 1997, however, Greenawalt began to change her banking practices pursuant to her embezzlement scheme. Greenawalt engaged in five different methods of fraudulent banking activity:

(1) Greenawalt altered checks payable to vendors of EES by changing the name of the vendor Payee to "Cash" and then cashing the check at the Bank. She also sometimes altered the amount of the check. ("vendor checks")

(2) Greenawalt manipulated checks payable to Ralph Bucci by changing the amount of the check, depositing the original amount in Bucci's account, and taking the difference in cash. ("Bucci checks")

(3) Greenawalt fraudulently indorsed checks payable to AWHD, a company owned by Greenawalt's son that was an occasional vendor of EES, and cashed them at the Bank. ("AWHD checks")

(4) Greenawalt prepared checks payable to credit card companies ostensibly to pay EES bills, had the Buccis sign them, input her own personal account number in the memo section of the checks, and then sent the checks to the credit card companies as payment for her personal bills. ("credit card payments")

(5) Greenawalt changed the amount on her employee paychecks, took them to the Bank, and cashed them. ("altered paychecks")

Greenawalt attempted to hide her actions in a variety of ways. Each month Wachovia sent EES an EES Account statement along with copies of the original canceled checks processed that month for the EES account; Wachovia also sent EES a monthly CAP Account statement (but not original checks), which included information regarding the payee, the amount, and the date of each CAP Account check.[5] Greenawalt would intercept the returned checks for the EES Account

_____

[5] Although EES disputes that it admits to always receiving monthly EES and CAP Account statements from Wachovia, it does admit that EES received the "vast majority of the checks and statements" from Wachovia with respect to both Accounts. *See* Pl.'s Resp. to Def.'s

and would sometimes change the name of the Payee from "Cash" back to the original vendor, or she would "black out" or erase her indorsement or the entry she put in the check's memo section. Other times she would tear off the top of the check where she had indorsed it. Greenawalt also at times inaccurately input transactions into EES's financial records database to make detection more difficult; she would enter the wrong date of a check, two transactions for a single check, or the wrong Payee name or check number.

EES estimates that, between 1997 and 2006, Greenawalt negotiated over 650 altered or unauthorized checks at the Linwood Wachovia. On October 31, 2006, one of the Buccis noticed a discrepancy in the company's financial records and began to suspect that Greenawalt was embezzling money from EES. That day Ralph Bucci spoke to a Linwood Wachovia teller who confirmed that Greenawalt had been routinely cashing checks from EES. Bucci advised the teller that Greenawalt was not authorized to do so. The next day, Bucci notified Wachovia's branch manager that Greenawalt had been cashing checks without his authorization. On November 2, 2006, Bucci confronted Greenawalt and she admitted to the embezzlement scheme.

After investigating the extent of Greenawalt's damage, Stephen Bucci contacted Wachovia's Loss Management department on August 29, 2007 to report the fraudulent scheme and complain of Wachovia's complicity in allowing it to take place. Wachovia disclaimed liability for any of Bucci's losses in a letter dated the same day. On February 25, 2008, Bucci filed suit against Wachovia seeking damages on the basis of Wachovia's failure to identify and report Greenawalt's suspicious behavior, thereby enabling her nine-year embezzlement scheme.

---

Factual Statement ¶¶ 9, 10, 13, 14, 19, ECF No. 74. Furthermore, EES fails to identify which statements it did not receive and does not quantify what percentage qualifies as a "vast majority." *See also infra* note 14.

Greenawalt was arrested and has pled guilty to stealing $925,000, of which she has agreed to pay back $250,000.

## III. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir. 1997). A fact is "material" if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there are no material facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The nonmoving party cannot rely upon "bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324.

The threshold inquiry at the summary judgment stage involves determining whether there is the need for a trial, that is, "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson*, 477 U.S. at 251-52.

## IV. DISCUSSION

In its Motion for Summary Judgment, Wachovia is correct that the PCC displaces EES's common law claims for negligence, breach of contract, and breach of the covenant of good faith and fair dealing. Wachovia is also correct that PCC § 4406(f) governs the majority of EES's claims[6]: § 4406(f) requires bank customers to assert against the bank unauthorized signatures on or alterations to checks within one year of being provided with certain details about their accounts, or otherwise forfeit their claims.

Wachovia further contends that it contractually shrank Section 4406(f)'s one-year time bar to forty days. In response, EES argues that it never received the contracts Wachovia now relies upon and thus, that it was unaware of the forty-day provision. I conclude that there is a genuine issue of material fact as to whether Wachovia supplied EES with notice of changes to the contractual provisions EES initially agreed to when it opened its bank accounts with Wachovia's predecessors. Consequently, for purposes of this Motion, the one-year default rule under Section 4406(f) must continue to govern.

The parties disagree as to the date on which EES properly notified Wachovia of the embezzlement scheme, but the earliest possible date was October 31, 2006. Consequently, Wachovia is relieved from liability to the extent that EES seeks to recover losses from checks

---

[6] Four of Greenawalt's five embezzlement methods involved an alteration ("vendor checks," "Bucci checks," "credit card payments," and "altered paychecks") and therefore fall under the § 4406(f) one-year notice requirement. Greenawalt's "AWHD checks" involved fraudulent indorsements and are therefore governed by § 3118's three-year statute of limitations instead.

containing alterations or unauthorized drawer signatures that were negotiated by Wachovia and represented in EES and CAP Account statements prior to October 31, 2005.

Furthermore, while EES has provided enough evidence to reach a jury on its aiding and abetting claim, that claim is limited by a two-year statute of limitations. Finally, EES's PUFA claims fail because EES has not opposed Wachovia's argument that the PUFA is inapplicable in this instance.

### A. EES's Common Law Claims Are Displaced by the PCC

The Pennsylvania Commercial Code regulates negotiable instruments and is intended to simplify and standardize commercial transactions. *New Jersey Bank, N.A. v. Bradford Sec. Operations, Inc.*, 690 F.2d 339, 345 (3d Cir. 1982). The Code displaces parallel common law claims (1) when it supplies a comprehensive remedy and (2) where "reliance on the common law would thwart the purposes of the Code." *Id.* at 346. For those reasons, in the instant case, PCC §§ 4401, 3406, 4406, and 3405 displace EES's three common law claims of negligence, breach of contract, and breach of the duty of good faith and fair dealing.

1. Comprehensive Remedial Scheme Provided by the PCC

    *a. Negligence*

The PCC establishes an elaborate and comprehensive negligence regime. PCC § 4401 creates a general cause of action in negligence, allowing aggrieved customers to assert claims against banks when banks charge items that are not properly payable against customer accounts.

However, other sections of the PCC offer substantial defenses for banks. Section 3406 creates a basic comparative negligence regime when checks have been altered or indorsements

forged.[7] Section 4406 makes this regime even more intricate in cases of altered checks or forged

drawer signatures where banks choose to provide their customers with account statements.[8]

Section 3405 treats forged indorsements in the employer-employee context, allocating loss

between the employer, to the extent it was negligent in entrusting the employee with

---

[7]PCC § 3406(a)-(b) reads:

(a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

(b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

[8]PCC § 4406(a) explains that if a bank chooses to send its customers an account statement, the statement must provide sufficient details to give the customer a sense of what items have been paid. Section 4406(c) then explains that once the bank has fulfilled its duty under subsection (a), the burden shifts to the customer to "exercise reasonable promptness in examining the statement" and "promptly notify the bank" of any "unauthorized payments." Section 4406(d) warns that if the customer fails to fulfill its duty under subsection (c), it is precluded from asserting the unauthorized signature of the customer or alteration of the same wrongdoer on any items the bank subsequently paid in good faith. However, section 4406(e) saves the customer from total preclusion under subsection (d) by allocating the loss based on the extent to which each party's negligence contributed to the loss if the customer can prove that the bank was negligent.

Although the term "unauthorized signature" as found in § 4406 has been interpreted in other contexts to apply to forged indorsements as well as forgeries of a drawer's signature, *see Travelers Indemnity Co. v. Stedman*, 895 F. Supp. 742, 746 n.2 (E.D. Pa. 1995), it is clear from the text of the statute that § 4406 applies only to alterations and forged drawer signatures, not forged indorsements. *See* PCC § 4406(c), (d); *see also* U.C.C. § 4-406 official cmt. 5 (2005) ("Section 4-406 imposes no duties on the drawer to look for unauthorized indorsements"); James J. White & Robert S. Summers, *Uniform Commercial Code* 817 (6th ed. 2010) (noting that § 4406 requires a customer to examine its bank statements "to discover forged checks, not forged indorsements on valid checks").

responsibility over the check, and the bank, to the extent it was acting in good faith but negligently paid or took the check.

In this matter, the regime established by PCC §§ 4401, 3406, 4406, and 3405 initially identifies Wachovia as the party at fault for crediting against EES's account items that were not properly payable. However, the scheme also allows Wachovia to attempt to shift the loss onto EES by proving that EES failed to exercise ordinary care, or to promptly notify the bank in cases of alterations, or to exercise proper control over its employee in cases of forged indorsements. EES then has the opportunity to demonstrate how Wachovia's negligence contributed to its losses. This scheme provides a comprehensive remedy for the parties to the transaction–a delicate balance that would be disrupted by the allowance of common law negligence claims–and thereby satisfies the *New Jersey Bank* displacement test, barring EES's common law negligence action.

### b. Contract and Duty of Good Faith Claims

EES brings a contract claim against Wachovia, alleging that Wachovia failed to act in accordance with its own policies or with industry standards, thereby breaching implied contractual duties of good faith and fair dealing.[9] Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. 33, ECF No. 70. However, the PCC also displaces these claims.

First of all, EES's claim that Wachovia did not act in accordance with its own policies or with industry standards is simply a restatement of its negligence claim, and is displaced by the PCC as discussed above. The same EES checks and the same actions by Wachovia are at issue in both EES's negligence and contract claims. Moreover, EES barely alters the language or content

---

[9] Although EES and Wachovia dispute whether an affirmative contract exists between them, I assume for purposes of this displacement argument that EES's conception of an implied contract is correct.

of its allegations when switching between the two. Whether under the heading of "negligence" or "contract," the PCC provides a comprehensive remedy for any failure by Wachovia to act in accordance with its own policies or with industry standards in this case.[10]

Furthermore, the PCC's good faith-related provisions confirm the displacement of EES's common law contract claims, and clearly displace EES's duty of good faith and fair dealing claims. The sole contractual duty EES identifies as existing between itself and Wachovia is the duty of good faith and fair dealing,[11] *see* Pl.'s Reply Mem. Opp'n to Def.'s Mot. Summ. J. 25, ECF No. 74, and EES also alleges breach of the duty of good faith and fair dealing in a separate count. However, PCC §§ 3405, 3406, and 4406 each have provisions that require consideration of the bank's good faith. PCC § 3406(a) notes that the section's preclusion defense applies only for one "who, in good faith, pays the instrument"; § 4406(e) states that "[i]f the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply"; and § 3405(b) explains the "rights and liabilities of a person who, in good faith, pays an instrument" fraudulently indorsed by an employee of the drawer. By thoroughly treating the role

---

[10]Not only do the two claims mirror one another on the face of the complaint, but there is also legal authority indicating that these assertions by EES belong in negligence only, and should not be brought in contract, further bolstering a finding of displacement by the PCC negligence regime. *See Matlack Leasing, LLC v. Morison Cogen, LLP,* No. 09-1570, 2010 WL 114883, at *6 (E.D. Pa. Jan. 13, 2010) ("First, failure to perform a service with a certain level of care typically constitutes a claim of negligence, not breach of contract. Second, a contractual provision to act with a required level of care 'cannot constitute a specific contractual promise.'"(quoting *Official Comm. of Unsecured Creditors of Corell Stell v. Fishbein and Co., P.C.,* No. 91-4919, 1992 WL 196768, at *5 (E.D. Pa. Aug. 10, 1992))).

[11] The PCC defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." U.C.C. § 1-201(b)(20) (2004). Fair dealing is thus a component of good faith. More specifically, "fair dealing" is a contextually-driven concept that is "concerned with the fairness of conduct rather than the care with which an act is performed." U.C.C. § 3-103 official cmt. 4 (2005).

of good faith in commercial transactions, the PCC supplants EES's breach of the duty of good faith and fair dealing claim, and therefore its breach of contract claim which relies exclusively on that duty.

In sum, EES's contract claims mirror its negligence claims and rely solely on the duty of good faith and fair dealing. Because the PCC treats negligence and good faith extensively, providing a comprehensive remedial scheme to address the liability of actors involved in an embezzlement scheme like Greenawalt's, EES's negligence, contract, and duty of good faith and fair dealing claims are displaced.

### 2. Purposes of the Code

In addition to the comprehensive remedial scheme offered by the PCC, this is a case in which allowing an action at common law would thwart the purposes of the Code. More specifically, the Pennsylvania state legislature's decision as to when to place the risk of loss on bank customers, and the Uniform Commercial Code's goal of uniformity, would be undermined were EES's common law claims to proceed.

In adopting the Code and its amendments, the Pennsylvania legislature has concluded that customers are better able than banks to minimize the risk of embezzlement. For instance, PCC § 4406(f) states,

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

Known as the "bank statement defense," subsection (f) is a powerful weapon for banks because it places the risk of loss squarely on customers after one year has passed. In this case the bank

13

statement defense looms large because while Greenawalt began her embezzlement scheme in late 1997, Wachovia was not even arguably put on notice by EES until October 31, 2006. Under § 4406(f), EES would be precluded from asserting against the Bank many, but not all, of its losses prior to October 31, 2005. The common law, in contrast, would not shift the risk of loss to customers as quickly. The statute of limitations is generally four years for breach of contract actions and two years for negligence actions. *See* 42 Pa. Cons. Stat. Ann. § 5525 (West 2002) (contract) and 42 Pa. Cons. Stat. Ann. § 5524 (West 2004) (negligence). Allowing common law claims to proceed alongside the PCC in this instance would therefore represent an affront to the legislature's policy decisions with regard to risk of loss in the embezzlement context.

Moreover, it is important to recognize that a key goal of the UCC is to establish uniformity among state commercial laws, thereby easing transactional costs. *See Menichini v. Grant*, 995 F.2d 1224, 1231 (3d Cir. 1993) (noting that "uniform application of legal principles . . . is a fundamental objective of the Code"). To permit common law claims such as EES's would be to permit non-uniform state law statues of limitations to govern. While Pennsylvania has four- and two-year statutes of limitation for contract and negligence actions respectively, other states have different schemes. *See, e.g.*, *Hansen v. Stanley Martin Cos.*, 585 S.E.2d 567, 573 (Va. 2003) (noting the difference between Virginia's five-year statute of limitations for breach of contract claims and Maryland's three-year statute of limitations). Displacement of common laws claims by a comprehensive statutory scheme promotes interstate commerce by allowing businesses to rely on one set of laws. *See Menichini*, 995 F.2d at 1231 ("'The finality of transactions promoted by an ascertainable definite period of liability is essential to the free negotiability of instruments on which commercial welfare so heavily depends.'" (quoting

*Fuscarello v. Indus. Nat'l Corp.*, 368 A.2d 1227, 1231 (R.I. 1977))).

In summary, in light of the PCC's comprehensive remedial scheme in relation to checks containing alterations or forged indorsements, and in recognition of the likelihood that permitting common law claims here would thwart the purposes of that scheme, I conclude that EES's negligence, breach of contract, and breach of the duty of good faith and fair dealing claims are displaced. I now turn to EES's claims under the PCC.

**B. PCC Liability**

The primary question regarding EES's PCC claims is when, if ever, they are barred by statutes of repose or limitations.[12] Genuine issues of material fact remain with respect to each party's potential comparative negligence, but many of EES's claims are barred from the outset as follows.

### 1. Default Rules of PCC Determine Wachovia's Liability Period

PCC § 3405 governs the AWHD checks, which contained no alterations or unauthorized EES signatures but did contain fraudulent indorsements. PCC § 3118's three-year statute of limitations applies to claims under § 3405. Therefore EES's ability to recover losses from Greenawalt's forged indorsements of AWHD checks is limited to those checks she embezzled after February 28, 2005, three years before EES initiated this action.

For all other checks, § 4406(f), and its one-year notification requirement, controls despite EES's protestations otherwise.[13] Section 4406(f) required EES to discover and report its

---

[12]*See supra* note 2.

[13] EES further contends that "[w]hile a legal claim which requires proof of the alteration or unauthorized signature of the customer would be unsuccessful if the plaintiff is precluded from raising those issues under §4406, this would have no impact on legal claims that do not

unauthorized signature or any alteration on a check within one year after the relevant account

statement or check was made available to it,[14] or else be precluded from asserting the

---

require an alteration or an unauthorized signature of the customer." Pl.'s Reply Mem. Opp'n to Def.'s Mot. Summ. J. 15, ECF No. 74. However, it is rather the case that § 4406(f)'s one-year notice requirement applies to all claims related to checks containing alterations or unauthorized customer signatures regardless of whether the cause of action is provided for by the PCC or any other theory. *See Wetherill v. Putnam Invs.*, 122 F.3d 554, 558 (8th Cir. 1997) ("[T]he time limits imposed by U.C.C. § 4-406 are applicable without regard to the theory on which the customer brings his or her action." (internal quotation marks omitted)); *Am. Fed. of Teachers, AFL-CIO v. Bullock*, 605 F. Supp. 2d 251, 262 (D.D.C. 2009) ("Section 4-406(f) establishes an absolute notice requirement for customers as a pre-requisite to bringing any claim against [a] bank."); *Euro Motors, Inc. v. Southwest Fin. Bank & Trust Co.*, 696 N.E.2d 711, 716 (Ill. App. Ct. 1998) ("The time limit imposed by UCC section 4-406 is applicable without regard to the theory on which the customer brings his or her action.") *Concrete Materials Corp. v. Bank of Danville & Trust Co.*, 938 S.W.2d 254, 259 (Ky. 1997) (noting that Section 4-406(f)'s one-year notice requirement "is a substantive bar that destroys the right to sue [a] bank, regardless of the theory on which the plaintiff brings the suit" (internal quotation marks omitted)); *Siecinski v. First State Bank of East Detroit*, 531 N.W.2d 768, 771 (Mich. Ct. App. 1995) ("The language of [Section 4-406(f)] does not restrict its application to any particular cause of action."). That said, the parties have not adequately briefed, and therefore I reserve the right to decide, whether the sweep of §4406(f) reaches aiding and abetting a breach of fiduciary duty. *See infra* Section IV.D.

[14]EES suggests that it may never have received certain of its account statements, but there is no genuine issue of material fact on this point. As previously stated, once the party moving for summary judgment carries its initial burden of demonstrating that there are no material facts supporting the nonmoving party's position, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. The nonmoving party must present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial, and cannot rely upon mere allegations or denials to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). In moving for summary judgment, Wachovia stated that "[d]uring all relevant times, Wachovia issued monthly statements for the CAP and EES Accounts," Def.'s Mot. Summ. J. 3, ECF No. 69, and cited deposition testimony in support, Def.'s Brief Supp. Mot. Summ. J. 13, ECF No. 72; Def.'s Factual Statement Supp. Mot. Summ. J., Ex. B, Hughes Dep. 60, ECF No. 73; *id.* Ex. C, Bucci Dep. 55-56. In response, EES asserts only that "it is disputed that Plaintiff admits to receipt of **every** . . . monthly account statement." Pl.'s Resp. to Def.'s Factual Statement ¶ 10, ECF No. 74; *see also id.* ¶¶ 9, 13, 14, 19. As evidence of this dispute, EES furnishes a verification of Stephen Bucci. However, Bucci in that verification *admits* that he *received* "the vast majority of the checks and statements for the EES account, and the vast majority of the statements for the CAP account." Second Verification of Stephen Bucci ¶ 2, ECF No. 74. Furthermore, EES fails to identify which statements it did not receive and does not

unauthorized signature or alteration against the bank. EES provided no notice of any kind to Wachovia until October 31, 2006,[15] and is therefore precluded from seeking relief for any check represented on account statements prior to October 31, 2005, if not later.

EES contends that § 4406(f) does not apply: first, EES argues that Wachovia failed to provide it with sufficiently detailed statements and therefore EES could not have discovered the alterations; second, EES argues that § 4406(f) does not apply when the bank has acted in bad faith. EES is incorrect on both accounts.

*a) No Reasonable Discoverability Requirement in Section 4406(f)*

EES claims that for certain checks, the information supplied by Wachovia was insufficient to put the company on notice of the embezzlement. For example, EES claims that Greenawalt sometimes presented a check to Wachovia that was payable to "Cash," but when Wachovia returned the canceled check, Greenawalt would alter it again to change the payee to that of a legitimate vendor. Pl.'s Resp. to Def.'s Factual Statement ¶ 28, ECF No. 74. EES argues that there was no way it could have detected Greenawalt's misconduct given the information Wachovia provided to EES.

PCC § 4406(a) explains that a "statement of account provides sufficient information if the item is described by item number, amount and date of payment." Then, § 4406(f) applies and there is a one-year reporting requirement for losses suffered due to check alteration. There is no "reasonable discovery" caveat to § 4406(f). PCC § 4406(f) states:

---

quantify what percentage qualifies as a "vast majority." Thus, EES has failed to meet its burden under Rule 56 of "showing a genuine issue for trial" on this point, and EES has no way around § 4406(f)'s one year requirement based on missing account statements.

[15] *See infra* Section IV.B.2.

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

Thus, once the bank fulfills its requirement under subsection (a) of providing the customer with a sufficiently informative statement, the customer has one year to provide the bank with notice of an alteration, regardless of whether the alteration was reasonably discoverable.

Wachovia clearly complied with § 4406(a) as is evident from the copies of the EES and CAP Account statements provided by the parties. For the EES Account, Wachovia mailed a monthly statement that included the original cancelled EES checks processed that month for the EES Account. The statements contained information describing the items paid by number, amount, and date of payment. For the CAP Account, Wachovia mailed EES a monthly statement that did not include original cancelled checks, but did state who the payee of each check was (including if the "payee" was "CASH"), and also described the items paid by number, amount, and date of payment. *See* Def.'s Factual Statement Supp. Mot. Summ. J. 3-5, ECF No. 73; *id.* Ex. B, Hughes Dep. 60; *id.* Ex. C, Ralph Bucci Dep. 55-56. Therefore, § 4406(f) is triggered, with no reasonable discoverability qualification. As a result, even if EES could not reasonably have discovered Greenawalt's misconduct by inspecting the returned checks or bank statements, EES's claims are nevertheless still subject to 4406(f)'s one-year notice requirement and barred as to checks and statements returned before October 31, 2005.

### b) No Bad Faith Exception to Section 4406(f)

EES next argues that PCC § 4406(f) does not apply when the bank has acted in bad faith

(i.e., failed to act in good faith). EES principally relies on the logic of *Falk v. Northern Trust Co.*, 763 N.E.2d 380 (Ill. App. Ct. 2001). In *Falk*, the court noted that under UCC § 1-203, "every contract or duty contains an obligation of 'good faith' in its performance or enforcement" and concluded that § 4-406(f) incorporated the good faith requirement of § 1-203. *Id*. at 386-87. However, the court recognized that while UCC § 4-406(e) specifically states that a customer may avoid preclusion under § 4-406(d) if the customer can prove that the bank acted in bad faith, § 4-406(f) has no such explicit "good faith" requirement. *Id*. at 386. The court also recognized that prior to the 1992 amendments to the UCC, "section 4-406(1) required the bank to have paid the items in 'good faith' before the time limitation in section 4-406(4) would run." *Id*. at 385 (explaining that § 4-406(1) was the precursor to § 4-406(a) and that § 4-406(4)'s one year notice requirement was incorporated into § 4-406(f)). The 1992 amendments, however, eliminated the term "good faith" from § 4-406(a) and it was not added to § 4-406(f). *Id*. The *Falk* court conceded that, had the drafters intended to retain a good faith requirement in § 4-406(f), they could have done so explicitly. *Id*. at 386.

Given these recognitions and confessions, I find the *Falk* court's reasoning unpersuasive.[16] Instead, I agree with those courts that have placed greater weight on the fact that the 1992 amendments stripped § 4-406(a) of the "good faith" requirement and omitted any mention of "good faith" in § 4-406(f), despite including it in §§ 4-406(d) & (e). *See Halifax Corp. v. First Union Nat'l Bank*, 546 S.E.2d 696, 703 (Va. 2001) (finding no "good faith'

---

[16] EES also relies on *Lichtenstein v. Kidder, Peabody & Co.*, 777 F. Supp. 423 (W.D. Pa. 1991). However, *Lichtenstein* was based on UCC § 4-406 as it was prior to the 1992 amendments and therefore it is not relevant authority. *See id*. at 427 (declaring that "a bank which has engaged in fraudulent conduct has . . . acted in bad faith and is not entitled to the protection of section 4406(d)," which was the Pennsylvania counterpart to UCC § 4-406(4)).

requirement in Virginia's version of § 4-406(f)); *see also Am. Fed. Teachers, AFL-CIO v. Bullock*, 605 F. Supp. 2d 251, 259 (D.D.C. 2009) (same under District of Columbia law, citing *Halifax* approvingly); *Pinigis v. Regions Bank*, 977 So. 2d 446, 450-57 (Ala. 2007) (same under Alabama law, citing *Halifax* approvingly); *Chester Twp. Bd. Trs. v. Bank One, N.A.*, No. 2005-G-2660, 2007 WL 1881311, at *7-8 (Ohio Ct. App. June 29, 2007) (same under Ohio law, comparing *Halifax* with *Falk* and supporting *Halifax*).

I also refuse to incorporate § 1-203's general "good faith" requirement into the framework established by § 4-406(f). As one court has written, "[Section 1-203] is a statute of general application whereas [Section 4-406] is a statute of specific application. When one statute speaks to a subject in a general way and another deals with a part of the same subject in a more specific manner, where they conflict, the latter prevails." *Halifax*, 546 S.E.2d at 703 (internal quotations and ellipsis omitted). *Falk*'s public policy argument notwithstanding, the proper statutory interpretation of PCC § 4406(f) is that it does not include a "good faith" requirement.

## 2. Section 4406(f)'s One-Year Notice Requirement Triggered

Given then, that § 4406(f)'s one-year notice requirement controls, I must now determine when exactly EES provided notice to Wachovia. EES claims that it provided notice on October 31, 2006 or November 1, 2006 when Ralph Bucci spoke with a Linwood Wachovia teller, discovered that Greenawalt had been routinely cashing checks, and informed the branch manager that Greenawalt had been cashing checks without authorization to do so. Wachovia argues that EES did not provide notice until at least August 29, 2007, the date on which Stephen Bucci contacted Wachovia's Loss Management department to report the fraudulent scheme and complain of Wachovia's complicity in allowing it to take place. Alternatively, Wachovia argues

that EES never properly notified the Bank prior to the institution of this litigation.

Wachovia argues that EES's obligation to "report" problematic transactions (i.e., alterations or unauthorized signatures) under section 4406(f) consists of a duty to provide the bank with information "'sufficient to at least identify the quantity of checks involved, their amounts, the dates and check numbers, the names of the payees, or any other specific information upon which the bank could have acted.'" Def.'s Brief Supp. Mot. Summ. J. 19, ECF No. 72 (quoting *Watseka First Nat'l Bank v. Horney*, 686 N.E.2d 1175, 1179 (Ill. App. Ct. 1997)). EES notes that the case law is thin regarding a customer's reporting duties under section 4406(f), and argues that some courts have found that a customer need only provide the bank with notice of the customer's belief that forged or altered checks have been negotiated to satisfy its burden.

While no Pennsylvania court or any court examining Pennsylvania law has opined on this issue, Wachovia's position is supported by the text of § 4406(f) as well as case law from other jurisdictions. PCC § 4406(f) states that the customer must "discover and report the customer's unauthorized signature on or any alteration on the item," about which the customer is concerned. This has been interpreted to mean that a customer may not simply state a nebulous belief of foul play. *See* Henry J. Bailey & Richard B. Hagedorn, *Brady on Bank Checks* ¶ 32.05[1] (2010 ed.) (remarking that most courts have required that a customer provide enough details for the bank "to identify the items that have been forged or altered or have forged indorsements"); *see also* A. Brooke Overby, *Check Fraud in the Courts After the Revisions to U.C.C. Articles 3 and 4*, 57 Ala. L. Rev. 351, 401 (2006) ("[G]eneral notice to the payor bank that a theft has, or might have, occurred is not sufficient 'notice' under section 4-406. Rather, specific notice of specific items that are forged or altered is required.").

Those courts that have examined this question have concluded that some level of specificity is required. *See ASP Enterprises, Inc. v. Guillory*, 22 So. 3d 964, 980 (La. Ct. App. 2009) (citing *Overby*, *supra*, and concluding that plaintiffs had failed to identify items with particularity until after the litigation had commenced); *First Place Computers, Inc. v. Sec. Nat'l Bank of Omaha*, 558 N.W.2d 57, 61 (Neb. 1997) (noting that the statutory text required the customer to discover and report "the item" at issue and concluding that the customer's expression of "general concerns about irregularities" in its account was not sufficient notice); *Villa Contracting Co. v. Summit Bancorporation*, 695 A.2d 762, 766 (N.J. Super. Ct. Law Div. 1996) (explaining that in order to provide sufficient notice, a customer must "deal in specifics rather than generalities"). In fact, the case EES cites in support of its contention that customers need only notify a bank of the possibility of fraud, *New Properties, Inc. v. Newpower*, No. 259932, 2006 WL 2632310 (Mich. Ct. App. Sept. 14, 2006), provides greater support for Wachovia's position. In *New Properties*, the court distinguished the case's facts from *First Place Computers* and *Villa Contracting* because in *New Properties*, the customer had provided the bank with "specific information that the Bank could have acted on, including the date of and amounts of the wire transfers [and] the account they were deposited in." 2006 WL 2632310, at *12.

Wachovia argues that EES never identified specific checks prior to the start of this litigation.[17] EES argues that Ralph and Stephen Bucci reported the fraud to the Linwood Wachovia in October 2006, that numerous times thereafter Stephen Bucci frequently went to the

---

[17] Wachovia's alternative argument that EES provided notice on August 29, 2007 when Stephen Bucci reported the loss to Wachovia's Loss Management Group is without merit. The evidence before me indicates that Stephen Bucci provided no more information to the Loss Management Group than Wachovia claimed it received on October 31, 2006 or November 1, 2006.

branch to obtain copies of the checks at issue, and that Bucci and the branch personnel discussed numerous individual checks that were thought to be problematic. *See* Pl.'s Reply Mem. Opp'n to Def.'s Mot. Summ. J. 19, ECF No. 74. All agree that the first possible date upon which EES could have given any notice to Wachovia is October 31, 2006. It remains an open question of fact whether EES did indeed provide sufficient notice on that date, or when thereafter EES's identification of problematic checks was sufficient to satisfy § 4406(f). Therefore, applying § 4406(f) to this date and working back one year reveals that EES is certainly precluded from seeking relief under the PCC for any check negotiated and represented in an account statement prior to October 31, 2005. To the extent that EES seeks relief under the PCC for a check negotiated after October 31, 2005, it should be prepared to provide evidence at trial that someone at EES reported the specific check to Wachovia within one year of receiving the monthly statement on which the check appeared.

### C. No Further Contractual Restrictions

Wachovia argues that its liability is further limited by two account agreements, the Commercial Deposit Account Agreement, whose effective date was August 29, 2003 (the "2003 Agreement"), and the Deposit Agreement and Disclosures for Commercial Accounts, whose effective date was October 28, 2004 (the "2004 Agreement"). Those Agreements explained that a Wachovia customer who fails to discover and report to Wachovia "a forged, unauthorized or missing signature or indorsement, a material alteration, . . . or any other error or discrepancy relating to a check, deposit or other credit or debit entry" to the customer's account within 30 days (under the 2003 Agreement) or 40 days (under the 2004 Agreement) forfeits "any and all rights . . . to assert the error or discrepancy against [Wachovia]." *See* Def.'s Factual Statement

Supp. Mot. Summ. J., Ex. A-4, ¶ 14, ECF No. 73 (2003 Agreement); *id.* Ex. A-6, ¶ 14 (2004 Agreement). As Wachovia explains, the Agreements contractually shrank the one-year notice requirement under PCC § 4406(f). Def.'s Brief Supp. Mot. Summ. J. 17, ECF No. 72. Wachovia argues that EES did not properly report Greenawalt's embezzlement scheme until August 29, 2007, and because Greenawalt's scheme ended in 2006, the time limitations in the Agreements preclude EES from obtaining any relief.

EES contends that Wachovia's evidence regarding the mailing of the Agreements was produced after the end of discovery and therefore must be excluded, that it never received the Agreements, and that, in any case, the provisions of the Agreements cannot bind EES because the Agreements are unconscionable contracts of adhesion.

It is inappropriate to exclude Wachovia's evidence regarding the mailing of the Agreements, but Wachovia's evidence is insufficient to trigger any presumption as to their receipt. Thus there remains a material question of fact regarding whether Wachovia provided the Agreements to EES. Consequently, and regardless of Wachovia's alleged bad faith, PCC §§ 4406 and 3118 will continue to govern for purposes of this motion.

1. Exclusion of Evidence Regarding the Agreements

In support of its position that EES's claims are further limited by the provisions within the 2003 and 2004 Agreements, Wachovia relies on the affidavit of its corporate representative, Katherine A. Kuleba, Senior Vice President, Integration Program Management for the Office of Transition. Def.'s Factual Statement Supp. Mot. Summ. J., Ex. A, Kuleba Aff. ¶ 1, ECF No. 73. EES notes that neither Kuleba nor any of the evidence Kuleba relies upon, with the exception of the 2004 Agreement, was disclosed by Wachovia prior to the close of discovery. EES requests

that I exclude Kuleba's affidavit and the evidence she relies upon as a sanction under Fed. R. Civ. P. 37(c)(1), which states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

The Third Circuit employs a balancing test in any Rule 37 exclusion analysis. Courts are to consider:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.

*In re TMI Litig.*, 193 F.3d 613, 721 (3d Cir. 1999) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977) [hereinafter *Pennypack*]).

Regarding the first *Pennypack* factor, EES cannot claim to be prejudiced or surprised by Kuleba's affidavit. As Wachovia indicates, the Bank supplied EES with the 2004 Agreement on June 11, 2008. Def.'s Sur Reply, Ex. A, ECF No. 75. In its initial disclosures, dated June 26, 2008, Wachovia noted that the account agreements between Wachovia and EES could be used to support its claims or defenses. *Id*. Ex. B. On July 6, 2009, Wachovia filed its Answer to EES's Complaint and asserted that EES's claims were "barred, in whole or in part, by [EES's] failure to comply with [its] Account Agreement(s) with Wachovia." Answer ¶ 131, ECF No. 52. Although Wachovia failed to provide EES with the welcome packages, including the 2003 Agreement, an error that Wachovia classifies as inadvertent, EES acknowledges that it received the 2004 Agreement during the course of discovery, *see* Pl.'s Reply Mem. Opp'n to Def.'s Mot. Summ. J.

2, ECF No. 74, and the above evidence demonstrates that EES was on notice that Wachovia was going to rely on the Account Agreements. Given that EES's strategy to overcome the terms of the Agreements is to claim that it never received them during the course of the embezzlement scheme, it should have recognized the likelihood that Wachovia would bring forth an affidavit from a corporate representative demonstrating that the bank did send EES the Agreements in the normal course of its business.

In addition, with regard to the second *Pennypack* factor, ability to cure, EES has had ample time to cure any prejudice it might have suffered due to Wachovia's misconduct. Wachovia included the Kuleba affidavit within its Factual Statement, which was filed on February 16, 2010. Def.'s Factual Statement Supp. Mot. Summ. J., Ex. A, Kuleba Aff., ECF No. 73. With no imminent trial date, EES could have requested that I reopen discovery for the limited purpose of allowing EES to explore Kuleba's allegations and the documents upon which she relied. Instead, EES chose to request that I exclude the evidence not only from my consideration of Wachovia's Motion for Summary Judgment, but also at any subsequent trial. Given that the Third Circuit has stated that the "exclusion of critical evidence is an 'extreme' sanction, not normally imposed absent a showing of willful deception or 'flagrant disregard' of a court order," *Pennypack*, 559 F.2d at 905 (citing *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96, 99 (3d Cir. 1977)), EES should have attempted to cure the prejudice before requesting such an extreme sanction.

Moreover, EES has not shown that Wachovia's behavior amounts to willful deception or a flagrant disregard of a court order. Other than this dispute over Kuleba's affidavit, Wachovia has not exhibited a pattern or practice of disregarding court orders during the course of this

litigation, and has been forthright with EES that it planned to rely on its Account Agreements to bar EES's claims. Therefore, the fourth *Pennypack* factor also weighs against excluding the evidence.[18]

In sum, after weighing the applicable *Pennypack* factors, I conclude that excluding Kuleba's affidavit and the evidence upon which she relied would be inappropriate.

### 2. Binding Effect of the Agreements

Next, EES argues that the Agreements have no binding effect on the company's rights in this matter. EES contends that it never received the Agreements, that Kuleba's affidavit is insufficient to show that the Agreements were sent to EES, and, in the alternative, that the contractual limitations contained in the Agreements are void due to unconscionability.

"Under Pennsylvania law, proof of mailing raises a rebuttable presumption that the mailed item was received." *Carnathan v. Ohio Nat'l Life Ins. Co.*, No. 1:06-CV-999, 2008 WL 2578919, at *3 (M.D. Pa. June 26, 2008) (citing *Samaras v. Hartwick*, 698 A.2d 71, 73 (Pa. Super. Ct. 1997). In order for the so-called "mailbox rule" presumption to be triggered, "'the party who is seeking the benefit of the presumption must adduce evidentiary proof that the letter was signed in the usual course of business and placed in the regular place of mailing.'" *Geise v. Nationwide Life & Annuity Co.*, 939 A.2d 409, 423 (Pa. Super. Ct. 2007) (quoting *Commonwealth v. Thomas*, 814 A.2d 754, 758-59 (Pa. Super. Ct. 2002)). "'Once this presumption is established, the party alleging that it did not receive the letter has the burden of establishing such, and merely asserting that the letter was not received, without corroboration, is

---

[18] The third *Pennypack* factor, regarding the impact on the orderly and efficient trial of this matter, is not relevant at this stage.

insufficient to overcome the presumption of receipt.'" *Id.* (quoting *Donegal Mut. Ins. Co. v. Ins. Dept.*, 719 A.2d 825, 827 (Pa. Commw. Ct. 1998)).

Wachovia seeks to establish proof of mailing via the Kuleba affidavit. Kuleba there indicates that welcome packages were sent to "the address of each customer as set forth in a System Files Database. The address contained in the System Files Database was the address provided by the customer upon account opening . . . . That database was the same used for sending monthly account statements to First Union customers." Def.'s Factual Statement Supp. Mot. Summ. J., Ex. A, Kuleba Aff. ¶ 5, ECF No. 73. Kuleba further states that from 2001 to 2003, she was "present as each of those [welcome] packages was addressed and prepared for mailing. To insure accuracy, a live laser verification process was utilized so that the address of each customer was accurately captured for purposes of mailing the introductory packages." *Id.* ¶ 10. Kuleba searched her files and determined that the packages were sent to the correct address and found no evidence that the packages were returned undeliverable. *Id.* ¶ 12. Finally, Kuleba asserts that "[i]t is the established practice and policy of Wachovia that any notifications of changes or amendments to an Account Agreement are sent in the mail together with the customer's monthly statements or via a separate mailing." *Id.* ¶ 13.

However, after reviewing Kuleba's affidavit, which is the only evidence Wachovia provides to support its reliance on the mailbox rule presumption, I conclude that Wachovia has not produced enough evidence to trigger the presumption. Kuleba's affidavit fails to provide a sufficient level of detail with regard to how the packages were prepared for mailing and it does not demonstrate that the packages were "placed in the regular place of mailing." *Thomas*, 814 A.2d at 760. *Carnathan* and *Geise* provide examples of the level of detail that parties are

28

routinely asked to provide to trigger the presumption.

In *Carnathan*, the party seeking to trigger the presumption provided the following evidence of its business practice:

> [A]fter the computer automatically generates the list of premium notices, the notices are printed and placed by an Ohio National employee into an 'inserter machine' that folds the premium notices and places them into window envelopes; the notices are then metered and picked up by the PSI Group, an outside vendor that transports the letters to its facility and sorts them based upon zip code and other factors . . . ; after a quality control check is performed by PSI, the United States Postal Service picks up the mail at PSI's facility.

2008 WL 2578919 at *4. The quality control check performed by the outside vendor involved a comparison of the vendor's machine count of the mail with the count the party provided on its pickup slip. *Id*.

In *Geise*, the party seeking to trigger the presumption provided extensive testimony from its manager of distribution services regarding its mailroom customs and procedures. 939 A.2d at 424-25. Under examination, the manager admitted that at times the inserter machine in the mailroom malfunctioned, jammed, or ripped a notice. The company's representatives also admitted that once someone placed an individually-generated letter in a mail station, there was no way for them to know if the letter was actually mailed. In addition, when the company attempted to rely on its computerized billing lists, it was forced to admit on cross-examination that the billing list did not indicate whether the notices were mailed. Finally, the evidence also showed that the company employed a third-party vendor to pre-sort the mail and that the vendor did so in a warehouse where the company's mail was commingled with mail from other companies prior to delivery to the United States Postal Service. *Id*.

The level of detail regarding a business's mailing practices adduced in the *Carnathan* and

*Geise* cases is completely absent from Kuleba's affidavit. Kuleba states that she was there as each of the "packages was addressed and prepared for mailing," but she does not indicate whether Wachovia used a third party vendor, as the parties in both *Carnathan* and *Geise* did, and as one would presume a major bank like Wachovia would employ, or whether Wachovia employees stuffed, sorted, and mailed the packages themselves. Moreover, absent from the exhibits accompanying Kuleba's affidavit are any copies of the correspondence bearing EES's name or any proof of mailing from the Postal Service.

It is obvious that both parties would have benefitted from having Kuleba testify in a deposition. However, as has already been discussed, Wachovia failed to disclose that it intended to rely on Kuleba. Now it seeks the benefit of the mailbox rule presumption without providing the requisite level of detail regarding its mailing practices necessary to trigger the presumption under Pennsylvania law. Because Wachovia failed in this regard, it has not sustained its burden to trigger the presumption. *See Thomas*, 814 A.2d at 760 ("[O]ffering generic testimony as to the standard mailing procedures for . . . notices" is insufficient to trigger the presumption).

Wachovia also argues that regardless of whether EES received the Account Agreements and change of terms notices, EES agreed to abide by the Agreements by continuing to use its bank accounts. Both Agreements state that "[w]hen you open, use and/or maintain an account with us, you are agreeing to the terms of this Agreement." Def.'s Factual Statement Supp. Mot. Summ. J., Ex. A-4, at 6, ECF No. 73 (2003 Agreement); *id.* Ex. A-6, at 3 (2004 Agreement). Wachovia relies on three cases in support of its contention that when a customer engages in a banking relationship with its bank, it implicitly accepts the terms of the bank's relevant account agreement and binds itself to the terms of the agreement. None of the three cases, *Baylis v.*

30

*Wachovia Bank, N.A.*, No. 08-3392, 2008 WL 5055746 (E.D. Pa. Nov. 25, 2008), *Reliance Ins.*

*Co. v. Bank of America Nat'l Trust & Savings Ass'n*, No. 99 C 3366, 2001 WL 62597 (N.D. Ill.

Jan. 25, 2001), and *Herrington v. Union Planters Bank, N.A.*, 113 F. Supp. 2d 1026 (S.D. Miss.

2000), examine Pennsylvania state law and none are binding on me.

Moreover, in each case, the courts either found that the customer had received the

relevant account agreement or there was no question that the customer had received it. *See*

*Baylis*, 2008 WL 5055746, at *3 (finding that the customer had received the mailing of the

depositor agreement which contained a provision compelling arbitration); *Reliance Ins. Co.*,

2001 WL 62597, at *5 (noting that there was no dispute that the customer had received the

account agreements and monthly statements); *Herrington*, 113 F. Supp. 2d at 1026-35 (noting

that the financial institution sent its customers changes in the terms of the conditions of their

deposit accounts and indicating no dispute regarding that fact). Thus, the three cases cited by

Wachovia are inapposite to this matter, which involves a genuine issue of material fact as to

whether EES received the 2003 and 2004 Agreements.[19]

In sum, for purposes of this motion, the default rules of the PCC govern, and the motion

---

[19] EES's argument that the Account Agreements are unconscionable contracts of adhesion is moot until Wachovia can demonstrate that EES received them. However, at the very least it is clear that there is nothing particularly unconscionable about a bank contractually decreasing the notification time limit from one year to 30 or 40 days. This is a relatively common practice and has been approved by many courts. *See generally* White & Summers, *supra*, § 19-2 (collecting cases). Moreover, if EES received the Account Agreements and disliked the change, it could always choose to do its banking elsewhere. *See Cronin v. Citifinancial Servs., Inc.*, No. 08-1523, 2008 WL 2944869, at *3-4 (E.D. Pa. July 25, 2008) (concluding that an arbitration agreement was not unconscionable where plaintiff failed to show that he could not have obtained financial services from another institution). Whether other provisions in the Account Agreements are valid, such as the language that eliminates the good faith requirement imposed on all contracts under the UCC, is a question that I need not address at this stage.

is granted with respect to fraudulent indorsement claims on checks negotiated prior to February 25, 2005 as well as with respect to altered or forged signature claims on checks appearing on account statements prior to October 31, 2005. At or before trial, the parties may present additional evidence as to the notice of fraud provided by EES to Wachovia after October 31, 2005 and as to whether Wachovia mailed and EES received the 2003 and 2004 Agreements.

### D. Aiding and Abetting

To state a claim for aiding and abetting a breach of fiduciary duty, three elements must be satisfied: (1) there must be a breach of fiduciary duty; (2) the defendant must have knowledge of that breach; and (3) the defendant must have provided "substantial assistance or encouragement" in effecting that breach. *See Koken v. Steinberg*, 825 A.2d 723, 732 (Pa. Commw. Ct. 2003) (citing *Thompson v. Glenmede Trust Co.*, No. 92-5233, 1993 WL 197031 (E.D. Pa. June 8, 1993)).

Wachovia argues, as a threshold matter, that EES cannot succeed on its aiding and abetting the breach of a fiduciary duty claim because the Pennsylvania Supreme Court has not yet recognized such a claim. Yet Wachovia also acknowledges that several Pennsylvania appellate courts and federal district courts in the Eastern District of Pennsylvania, including this Court in *Bucci v. Wachovia Bank, N.A.*, No. 08-1478, 2009 WL 1740503, at *4 (E.D. Pa. June 17, 2009) [hereinafter *Bucci II*], have concluded that the Pennsylvania Supreme Court would recognize such a claim. Given my refusal to dismiss an aiding and abetting claim in *Bucci II*, as well as the ample case law supporting the prediction that the Pennsylvania Supreme Court would recognize such a claim, I decline Wachovia's invitation to dismiss EES's claim for failure to state a valid

claim under Pennsylvania law.  *See, e.g.*, *Chicago Title Ins. Co v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 317-18 (E.D. Pa. 2007) (collecting cases in which a "vast majority of district courts" in the Third Circuit have supported an aiding and abetting claim under Pennsylvania law).

The parties also dispute what level of knowledge is required to satisfy the second element of the aiding and abetting claim. Wachovia argues that the knowledge required is direct knowledge.  In support of its argument, Wachovia cites *Halifax Corp. v. Wachovia Bank*, 604 S.E. 2d 403, 414 (Va. 2004) [hereinafter *Halifax II*], where the Virginia Supreme Court found that unless a bank "actually knows a breach of fiduciary duty is occurring and participates with *mens rea* in the consummation of the breach, it should not be held liable for aiding and abetting the breach." *Id.*

However, Wachovia's argument is unavailing for two reasons. First, the *Halifax II* court discussed the definition and requirements of "knowledge" primarily in the context of Virginia's version of UCC § 3-307, but UCC § 3-307 details when the taker of an instrument has notice of claims and loses its status as a holder in due course. UCC § 3-307 may shed light on EES's aiding and abetting claim, but does not govern it.[20]  Second, the *Halifax II* decision is not binding

---

[20] EES argues that PCC § 3307(b)(2) sets forth certain circumstances in which knowledge of a breach of fiduciary duty can be imputed.  For example, "[i]n the case of an instrument payable to the represented person . . . the taker has notice of the breach of fiduciary duty if the instrument is . . . deposited to an account other than an account of the fiduciary, as such, or an account of the represented person."  *Id*. § 3307(b)(2)(iii).  EES claims that Wachovia had notice (i.e., knowledge) of a breach of fiduciary duty when Greenawalt presented a check payable to Ralph Bucci and asked that a portion be deposited into Bucci's personal account and a portion be cashed out to her (i.e., a split transaction check).  EES's expert states that his review of Greenawalt's history of transactions shows that she made cash deposits to her own personal

on me, and while I agree with the Virginia Supreme Court that mere negligence cannot support an aiding and abetting claim, other Pennsylvania courts have indicated that recklessness and willful blindness, in addition to direct knowledge, are sufficient.

In *Bucci II*, I determined that an aiding or abetting claim could survive if EES could show that the bank "knowingly or recklessly cash[ed] [Greenawalt's] unauthorized checks and turn[ed] a blind eye to her irregular banking practices."  2009 WL 1740503 at *4.  Two other district court cases in this jurisdiction examining Pennsylvania law have also determined that direct knowledge is not required.  *See Matlack Leasing, LLC*, 2010 WL 114883, at *11 (noting that plaintiff's allegations that defendants were "willfully blind" to the fiduciary's breaches was sufficient); *Adena, Inc. v. Cohn*, 162 F. Supp. 2d 351, 357-58 (E.D. Pa. 2001) (citing *Schuylkill Skyport Inn, Inc. v. Rich*, No. 95-3128, 1996 WL 502280, at *38 (E.D. Pa. Aug. 21, 1996) for the proposition that "direct and knowing participation" is not required under an aiding and abetting claim).

In light of this standard, EES's aiding and abetting claim survives Wachovia's motion for summary judgment. Open questions remain as to how much the bank knew, or willfully or

---

account on the same day she cashed company checks.

It is not clear if the facts as EES presents them fit into the narrow category of circumstances that establish notice under PCC § 3307(b)(2)(iii).  But if, for example, Greenawalt requested that one of Wachovia's tellers perform a split transaction, and then Greenawalt deposited the same amount of cash she received from the split transaction into her own personal account, a reasonable jury could find that Wachovia had violated PCC § 3307(b)(2)(iii).

Because Greenawalt always altered the amounts of the checks payable to Ralph Bucci when she employed the split transaction method, § 4406(f)'s one-year notice requirement restricts EES's claims under Section 3307 to those checks represented on statements after October 31, 2005.

recklessly refused to know, and as to whether that knowledge, or willful or reckless refusal, is sufficient under the law to constitute aiding and abetting. The record reveals that at least one of Wachovia's tellers at the Linwood Branch, Barbara Brousseau, knew that Greenawalt was EES's bookkeeper since at least 2001. Def.'s Factual Statement Supp. Mot. Summ. J., Ex. N, Brousseau Dep. 21:16-20, Sept. 3, 2009, ECF No. 73. Ms. Brousseau admitted that she received no training from 1997 going forward about Wachovia's policies on cashing checks. *Id*. at 27:9-11. According to EES's expert, Mr. Robert J. Diegel, Wachovia's policy with respect to split transactions was to provide cash to a fiduciary such as Greenawalt only if the Payee (i.e., Ralph Bucci) was present for the transaction and indorsed the check in the Bank's presence. Pl.'s Reply Mem. Opp. to Def.'s Mot. Summ. J., Ex. C, Report of Pl.'s Expert 12, ECF No. 74. The evidence shows that Ms. Brousseau, having had no training with regard to this policy, did not abide by the policy. In addition, Mr. Diegel stated that Wachovia's policy towards cashing company checks in general is that such checks are to be cashed for anyone who has proper identification. Wachovia only requires a teller to act if he/she has a subjective concern about the transaction. Mr. Diegel noted that such a policy, which allows its tellers "to routinely cash, without inquiry, large dollar checks drawn on a business account made payable to 'Cash'," represents a gross deviation from industry standards that, if implemented, aids and abets check fraud. *Id*. at 12. Given such evidence, a jury could find that Wachovia's failure to train its tellers or its reliance on the subjective concerns of its tellers demonstrated a willful blindness to the possibility of Greenawalt's embezzlement scheme. Viewing the facts in the light most favorable to EES, Wachovia's willful blindness led to an environment in which Greenawalt was able to embezzle nearly $1 million with the substantial assistance of the bank's tellers. Consequently,

Wachovia's motion for summary judgment regarding EES's aiding and abetting claims will be denied.

That said, Wachovia is correct that courts examining Pennsylvania law generally apply a two-year statute of limitations on aiding and abetting claims. *See Green v. Altman*, No. 03-6437, 2004 WL 2106552, at *8 (E.D. Pa. Sept. 21, 2004) (citing previous decisions in which courts determined that under Pennsylvania law "the tort of aiding and abetting a breach of fiduciary duty has a two-year statute of limitations"); *Ravitch v. Pricewaterhouse*, 793 A.2d 939, 941 (Pa. Super. Ct. 2002) (acknowledging appellant's concession that a two-year statute of limitations applies to negligence, fiduciary duty, and aiding and abetting claims); *Pierce v. Rossetta Corp.*, No. 88-5873, 1992 WL 165817, at *10 (E.D. Pa. June 12, 1992) (explaining that a two-year statute of limitations applies to claims of aiding and abetting a breach of fiduciary duty).

EES argues that the statute of limitations should be tolled based on the "continuing violation" doctrine and/or Wachovia's bad faith. Neither of EES's arguments are supported by case law. The continuing violation doctrine states that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). EES points to no case law in the Third Circuit or any Pennsylvania state court holding that an ongoing embezzlement scheme can be considered a continuing practice. Rather, courts are more inclined to view each discrete act of embezzlement as independently actionable. *See, e.g.*, *Rodrigue v. Olin Employees Credit*

*Union*, 406 F.3d 434, 443 (7th Cir. 2005) (explaining that the statute of limitations is triggered at the negotiation of a check that is part of an embezzlement scheme).

With respect to EES's argument that bad faith should toll a statute of limitations, as I noted in *Bucci I*, "the statute of limitations in commercial transactions may be tolled if the defendant is found to be guilty of fraudulent concealment."  591 F. Supp. 2d 773, 787 (E.D. Pa. 2008) (citing *Menichini*, 995 F.2d at 1231).  EES has never alleged that Wachovia or its employees affirmatively concealed information from EES or the Buccis and therefore there is no reason to allow a tolling of any statute of limitations in this action.  Therefore, Wachovia is correct that EES's aiding and abetting claims are time-barred to the extent they are related to checks reflected on account statements received by EES prior to February 25, 2006.

### E.  Uniform Fiduciaries Act ("UFA") claim

Finally, Wachovia argues that it is entitled to summary judgment on EES's Uniform Fiduciaries Act ("UFA") claim.  Wachovia contends that Greenawalt is not a fiduciary to which the UFA applies, as she did not have authority to draw or indorse checks on behalf of EES. EES failed to address this argument in its opposition papers, and therefore Wachovia's motion for summary judgment will be granted on this point.

### F.  Absent Checks

Finally, Wachovia argues that it is entitled to summary judgment with respect to 52 checks from 1998 that EES has not produced in discovery.  EES disagrees, but their arguments are moot in light of my earlier conclusions that EES's claims are barred, in one way or another,

with regard to checks negotiated prior to February 25, 2005.

## V. CONCLUSION

For the reasons stated above, Wachovia's Motion for Summary Judgment is granted in part and denied in part. EES's negligence (Count I), breach of contract (Count V), breach of duty of good faith and fair dealing (Count VI), and PUFA (Count XII) claims will be dismissed. EES's aiding and abetting claim (Count XI) is limited to those checks negotiated after February 28, 2006. EES's PCC claims under §§ 3307 (Count VII), 3406 (Count VIII), 4401 (Count IX), and 4406 (Count X) relating to checks that contained alterations or unauthorized customer signatures will be precluded to the extent they were negotiated and represented on an account statement prior to October 31, 2005. EES's PCC claims under section 3405 relating to checks that contained forged indorsements will be precluded to the extent they were negotiated prior to February 28, 2005.

s/Anita B. Brody

_____

Anita B. Brody, J.

COPIES VIA ECF ON      TO:      COPIES MAILED ON      TO: